IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SPIRO KASSIS** | : | **No. 19-449** |

# MEMORANDUM

PRATTER, J. FEBRUARY 17, 2021

Spiro Kassis seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A). The primary basis for his motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may affect him. The Government opposes Mr. Kassis's motion. For the following reasons, the Court denies the motion.

## BACKGROUND

### I. Mr. Kassis's Criminal Conduct

From August 2014 through February 2018, Mr. Kassis, a physician, operated a "pill mill" through his medical practice where he sold medically unnecessary prescriptions for controlled substances to drug dealers and those addicted to drugs. (Doc. No. 30 at 1) Almost every day, Mr. Kassis would see upwards of 60 people to whom he sold prescriptions for opioids, such as oxycodone. The going rate for a prescription was $200 cash. (Doc. No. 30 at 1) One of Mr. Kassis's patients was found dead in a motel room from an apparent prescription overdose. Another patient went to Mr. Kassis for help overcoming drug addiction, and Mr. Kassis prescribed him several controlled substances. The patient later crashed his vehicle while under the influence of these drugs and died. (Doc. No. 30 at 2)

In September 2019, pursuant to a written plea agreement, Mr. Kassis pled guilty to 11 counts of distribution of Schedule II controlled substances and three counts of distribution of Schedule III controlled substances. He also stipulated to having illegally distributed an additional 14,500 oxycodone pills between August 2014 and February 2017, all in violation of 21 U.S.C. § 841. (Doc. No. 4) At sentencing, Mr. Kassis asked the Court to impose a sentence less than the advisory range of 70 to 87 months' imprisonment due to his age and lack of criminal history. In February 2020, the Court imposed a below-guideline sentence of 48 months' imprisonment, and Mr. Kassis was permitted to surrender to the Bureau of Prisons in April 2020. (Doc. No. 19 at 2) The Court later granted several extensions of his surrender date. Mr. Kassis moved for a third extension based on his claims that he was at high risk for complications from COVID-19 due to his age, hypertension, and diabetes. The Government opposed. His third motion was denied, and Mr. Kassis surrendered to the BOP in late July 2020. (Doc. No. 30 at 3)

## II. Mr. Kassis's Request for Compassionate Release

On December 3, 2020, Mr. Kassis sent a request for compassionate release to his facility's warden. His request was based on his age and the risk several of his preexisting medical conditions posed should he contract COVID-19. (Doc. No. 28 at 3) The warden denied Mr. Kassis's request, finding that he did not meet the criteria for compassionate release. (Doc. No. 30 at 3)

In early January 2021, Mr. Kassis, through retained counsel, submitted a motion for compassionate release due to his age and the risks posed by his obesity, type 2 diabetes, hypertension, and asthma. (Doc. No. 28 at 1) In his motion, Mr. Kassis requests that the remainder of his sentence be served on home confinement.[1] (Doc. No. 28 at 1) Mr. Kassis's BOP medical

[1] To the extent Mr. Kassis seeks release to home confinement, the Court notes that "Congress did not provide the courts with the authority to release inmates into home confinement" as "[t]his discretion rests solely with the Attorney General and the BOP Director." *United States v. Pettiway*, No. 08-cr-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020).

records show that he is currently 68 years old and presents the conditions listed above. Based on his recent height and weight, Mr. Kassis's body mass index (BMI) was 32.2, which is considered obese. (Doc. No. 30 at 4) Mr. Kassis's medical records indicate that his conditions are currently well-controlled and that his institution provides him with any necessary medications. Mr. Kassis is otherwise fully ambulatory and engages in all normal activities of daily living. (Doc. No. 30 at 5)

## III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[2] and it has taken significant measures to protect the health of the inmates in its charge. These measures, among other things, include severely curtailing visitation, limiting the movement of inmates, paying special attention to social distancing, and screening and isolating new inmates. As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

---

2 BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 17, 2021).

3 This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

The Court recognizes that the COVID-19 pandemic represents a serious and fluid situation that can change at a moment's notice. BOP's efforts at combating the effects of the pandemic at FCI Schuylkill were successful for most of 2020, with only one identified case of COVID-19 among the inmate population during the first eight months of that year. *See United States v. Rae*, No. 15-cr-432, 2020 WL 4544387, at *4 (E.D. Pa. Aug. 6, 2020) ("With only one reported positive inmate case of COVID-19 out of a population of 1,029, FCI Schuylkill appears to be responding to and defending against the threats of the virus in a vigorous and generally effective manner."). During the past month, the facility experienced an outbreak to which BOP responded to with extensive testing and quarantine measures. (Doc. No. 30 at 7) The results were largely successful. As of February 17, 2021, there are currently 25 inmates and 14 staff members who are COVID-positive.[4] FCI Schuylkill houses 1,030 inmates. Overall, 247 inmates and five staff members have recovered from COVID-19 at FCI Schuylkill. There have been no COVID-19 related deaths at FCI Schuylkill.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

4 The data is current as of February 17, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

5 "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[6] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

---

6 Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

Moreover, there is a growing consensus among the circuit courts that the policy statement does not limit the Court's discretion to consider compassionate release under the First Step Act. *See, e.g.*, *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *See United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

**DISCUSSION**

The Court certainly does not minimize the critical health risk posed by COVID-19. But as very concerning as the current pandemic is, resolving Mr. Kassis's motion still calls upon the Court to take into serious consideration the limits imposed on it pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Kassis bases his request for relief on his age and several medical conditions.

Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[7] "While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

---

[7] *See People at Increased Risk*, Centers for Disease Control and Prevention (Jan. 4, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Feb. 17, 2021).

But for COVID-19, Mr. Kassis would likely present no basis for compassionate release. Due to the pandemic, Mr. Kassis asserts that he is more susceptible to complications from COVID-19 due to his age, obesity, Type 2 diabetes, hypertension, and asthma. (Doc. No. 28 at 11) The Government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 n.1.

The CDC recognizes both type 2 diabetes and obesity—measured as a BMI greater than 30 but less than 40—as underlying medical conditions that put an individual at an "increased risk of severe illness" from COVID-19.[8] Mr. Kassis's BOP medical records confirm that he has both type 2 diabetes and a BMI over 30. However, Mr. Kassis's diabetes appears well-controlled and he is provided medication by his institution. Although the CDC identifies obesity as a BMI of 30 or greater as presenting a risk,[9] Mr. Kassis's BMI is just above that threshold. (Doc. No. 30 at 4) Courts have generally denied compassionate release based on mild obesity. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) (noting that moderate asthma and mild obesity are not extraordinary circumstances in the context of institution with low number of positive cases).

The CDC also lists several conditions, including hypertension and moderate-to-severe asthma, where there "might be an increased risk for severe illness from the virus that causes COVID-19," but insufficient data exists to say more.[10] Mr. Kassis presents mild asthma, which

8 *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Feb. 3, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 17, 2021).

9 *Id.*

10 *Id.*

does not fall under the CDC's possible risk category. As to his age, Mr. Kassis is 68 years old. While the risk for severe illness from COVID-19 increases with age, the CDC notes that the "greatest risk" is among those aged 85 or older.[11] However, courts routinely deny motions for the extraordinary remedy of compassionate relief based on potential COVID-19 risk factors. *See, e.g.*, *United States v. Moldover*, No. 14-cr-637, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (defendant's asthma, hypertension, and obesity did not constitute extraordinary and compelling reason for release); *United States v. Ackerman*, No. 11-cr-740, 2020 WL 5017618, at *5 (E.D. Pa. Aug. 25, 2020) (compassionate release not warranted because "there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care"). Mr. Kassis has not established that his medical conditions—although perhaps problematic—are not monitored or appropriately managed with medication at FCI Schuylkill.

As to the current situation at FCI Schuylkill, the Court in no way minimizes the threat COVID-19 poses. There was a recent outbreak at FCI Schuylkill, and a large number of inmates were infected. That said, BOP has made efforts to control the outbreak and prevent its reoccurrence. (Doc. No. 30 at 6-7) The number of active cases at FCI Schuylkill has dropped significantly. As of February 17, 2021, FCI Schuylkill reports 25 inmates and 14 staff members are COVID-positive.[12] The COVID-19 pandemic remains a fluid and serious situation, and the BOP website continues to provide transparent information with the community about positive cases and recoveries.

---

11 *Older Adults*, Centers for Disease Control and Prevention (Dec. 13, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Feb. 17, 2021).

12 The data is current as of February 17, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

Even if Mr. Kassis presented extraordinary and compelling reasons warranting his compassionate release, consideration of the § 3553(a) factors necessitates a denial of Mr. Kassis's motion. He has failed to show how releasing him before he serves the full term (or a much more significant portion) of his sentence would align with the statutory sentencing factors, notably the seriousness of his offense, the need to deter others from similar criminal conduct, and the need to promote respect for the law and provide just punishment for his offense. *See* 18 U.S.C. § 3553(a).

Mr. Kassis blatantly abused his position as a physician by operating a "pill mill" where he sold prescriptions for controlled substances to drug dealers and those addicted to drugs. His crimes were serious and, among other harms to the community, led to at least two deaths. Mr. Kassis committed these crimes while he was of a similar age and in similar health as he is now. Mr. Kassis argues that compassionate release is warranted because, as a result of his actions, he is no longer allowed to practice medicine, he forfeited over $1 million, he destroyed his reputation, and he put his family under severe emotional strain. (Doc. No. 33 at 4-5) Far from justifying compassionate release, these consequences were the natural inevitable results of Mr. Kassis's conduct. They are not the ticket to freedom he seems to believe them to be. Even though Mr. Kassis has underlying medical conditions, he committed serious crimes that negatively impacted the lives of many people and their families, not just his own. An early release would not provide just punishment or serve as a deterrent to others, nor would it promote respect for the law. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded defendant's "crimes were extraordinarily serious," required "a significant period of incarceration," and early release was not warranted where defendant served just under 11% of a 180-month sentence).

Mr. Kassis has not yet served a significant portion of his sentence. He has served approximately six months, or just over 12%, of his 48-month sentence. An early release would be

contrary to the § 3553(a) factors. *See United States v. Shulick*, No. 16-cr-428, 2020 WL 3250584, at *5 (E.D. Pa. June 16, 2020) (denying compassionate release for defendant who had served 19 months of a 60-month sentence for embezzlement, fraud, and filing false tax returns); *United States v. Hasan-Hafez*, No. 16-cr-221-2 (KPF), 2020 WL 2836782, at *4-5 (S.D.N.Y. June 1, 2020) (denying compassionate release for inmate with sleep apnea, diabetes, hypertension and high cholesterol because "[i]t would undercut the § 3553(a) factors for the Court to allow [him] to serve just 13 months of a 45-month sentence").

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Kassis's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

**BY THE COURT:**

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**